FILED
2015 May-22  AM 10:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | |
|---|---|
| GADSDEN INDUSTRIAL PARK, LLC, | ] ] ] |
| Plaintiff, | ] ] |
| v. | ]   Case No. 4:14-cv-00039-KOB |
| | ] |
| THE UNITED STATES OF AMERICA; CMC, INC., and HARSCO CORPORATION, | ] ] ] ] |
| Defendants. | ] ] |

## MEMORANDUM OPINION

This matter comes before the court on Defendants CMC, Inc and Harsco Corporation's "Joint Motion for Summary Judgment," (Doc. 74), and CMC and Harsco's "Joint Motion to Exclude Testimony of DR Davies Contractor LLC," (Doc. 76).

Plaintiff Gadsden Industrial Park, LLC sued CMC and Harsco for conversion and negligence stemming from CMC and Harsco's burial and sale of three railroad track spur lines -- HN1, HS1, and HS2 -- owned by GIP at the former Gulf States Steel facility. That facility is now a Superfund site under 42 U.S.C. § 9607, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. GIP purchased part of the GSS facility in 2001, but excluded the facility's eastern portion from the sale because GIP feared environmental contamination on that portion of the site. GIP subsequently bought the spur lines, which were located on the eastern excluded property. CMC and Harsco are EPA contractors who buried and sold the spur lines during the remediation of the eastern excluded property. GIP alleges that CMC

and Harsco intentionally and/or negligently sold or buried the spur lines solely for their own profit.

CMC and Harsco moved for summary judgment, arguing they are government contractors entitled to immunity. Additionally, CMC and Harsco argue that GIP did not own the spur lines and, thus, cannot sue for conversion. Finally, CMC and Harsco argue that GIP has not produced any legitimate proof of damages. The court will deny CMC and Harsco's motion for summary judgment because, when the facts are taken in the light most favorable to GIP, CMC and Harsco are not entitled to immunity as government contractors and GIP has sufficiently shown its ownership of the tracks and the damages it suffered.

Before addressing CMC and Harsco's summary judgment motion, however, the court must rule on CMC and Harsco's *Daubert* motion to determine the record for summary judgment.

### I.  *Daubert* **Motion**

CMC and Harsco ask the court to exclude the testimony of Daniel R. Davies, GIP's expert on the spur lines' market value. Davies has over 20 years of experience in the Alabama railroad industry. GIP plans to offer Davies' testimony as to the spur lines' market value based on information he received from GIP regarding the spur lines, track market pricing information, his familiarity with the GSS facility including his work repairing track at the facility, and his familiarity with the market for track in Alabama. The court will grant in part and deny in part the motion.

Federal Rule of Evidence 702, as explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, controls determinations regarding the admissibility of expert testimony. *See* 509 U.S. 579, 589 (1993). "[U]nder the Rules the trial judge must ensure that any and all scientific testimony or

2

evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. The court may admit expert testimony when "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).

First, Davies is qualified. CMC and Harsco argue that Davies is not qualified to testify regarding the spur lines' market value because anyone could gather the same information Davies gathered. Davies did much more than merely gather prices, however. Davies applied his 20 years of experience and independent research to the information provided by GIP to determine what GIP could reasonably expect to receive for the spur lines if sold as salvage or retail rail, or what GIP would pay to replace the spur lines. Davies does not provide a lay opinion, as such information is not general knowledge, and is qualified to testify regarding the spur lines' market value based on his 20 years of experience in the industry.

Second, Davies's methodology is reliable. CMC and Harsco argue that Davies's methodology is not reliable because Davies did not actually inspect the spur lines, the eastern excluded property, the track conditions, the soil stability, or GIP's right to access the property. CMC and Harsco also argue that Davies's methodology is not reliable because Davies did not base his calculations on a true market survey.

In *United States v. 0.161 Acres of Land*, an economist testified regarding property values. *See* 837 F.2d 1036, 1039 (11th Cir. 1988). The economist "spent over 200 hours researching 145

land sales during the years 1976-84 in the downtown Birmingham area and reviewing economic data on the downtown area . . . but he did not have personal familiarity with specific parcels." *Id.* at 1039. The Eleventh Circuit found that the economist's "failure to acquaint himself with the substance of each of the 145 transactions in his study conceivably lessens the probative value of his testimony;" nevertheless, because the economist's "testimony has a rational foundation as to market value," the Eleventh Circuit concluded that his testimony should be permitted. *Id.* at 1039-41.

Davies did not personally inspect the spur lines (because CMC and Harsco sold HS1 and HS2 and allegedly buried HN1) and only relied on two comparable transactions for market research. However, Davies did review information about the spur lines and is familiar with the GSS facility's tracks. Like in *0.161 Acres of Land*, while his opinion might be more reliable had he inspected the spur lines and reviewed more transactions, it is admissible. The weight to assign his testimony is for the jury to decide.

Third, Davies's opinions are helpful to the jury. CMC and Harsco argue that Davies's opinions are not helpful because Davies merely provides a generic description of how track is sold and because Davies fails to show his calculations or ultimate conclusion. Again, CMC and Harsco are free to cross examine Davies about his market valuation methodology, but his opinions will assist the jury in determining the spur lines' market value.

Finally, CMC and Harsco object to Davies's opinion regarding the value of GIP's rail car storage business. Davies admits he is not an expert on this subject:

> Q.   All right. Do you consider yourself an expert in the field of valuing railroad car storage?
> A.   No, ma'am.

(Doc. 76-3, 27). Thus, he is not qualified to testify as a rail car storage expert.

Therefore, the court will not allow Davies's opinions regarding the value of GIP's rail car storage business and will allow the remainder of Davies's opinions.

## II.    Summary Judgment

### A.    Facts

The facts below, for purposes of summary judgment, are taken in the light most favorable to Gadsden Industrial Park. These facts may not be the true facts proved at trial.

### 1.    The Gulf States Steel Facility

Gulf States Steel owned a 761 acre steel producing facility in Gadsden, Alabama until it declared bankruptcy around 2001. The GSS facility contained 25 miles of railroad tracks, including multiple spur lines and a main line. Three of the GSS facility's spur lines were named HN1, HS1, and HS2. HN1 is 1000 feet long. HS1 and HS2, now scrapped, were 800 and 600 feet long, respectively. At some point in 2001, EPA designated the GSS facility as a Superfund site on the national priority list and began site remediation.

In May 2001, the Williams Family Limited Partnership purchased "over (25) miles of in-ground railroad track" at GSS's bankruptcy foreclosure auction. (Doc. 82-12, 3, 18). WFLP "had a permissive use license through the bankruptcy trustee to use the Track until such time as the real estate was sold. WFLP did not have a lease, license, or legal right to access or conduct business on Track on property that it did not own or otherwise have a contractual right to use." (Doc. 74-12, 3). WFLP used the tracks to operate a rail car storage business from 2001 to 2002 and used the spur lines to store rail cars until 2002.

In December 2002, GIP purchased a 400 acre portion of the GSS facility. GIP knew that EPA had designated the GSS facility as a Superfund site when it purchased the real property, and GIP excluded the facility's eastern 200 acres from the sale because it feared environmental contamination on that portion of the facility.

The eastern excluded property contained the spur lines at issue. The eastern excluded property also contained two large "slag piles" of non-hazardous scrap metal totaling approximately three million cubic yards. One slag pile was located north of several lagoons on the eastern excluded property near HN1. The other slag pile was located south of the lagoons near HS1 and HS2.

Between 2002 and 2005, WFLP, GIP, and a third party operated a rail car storage business using WFLP's tracks. The tracks were in good repair and not buried in 2005. In December 2005, GIP bought out its partners, purchasing all 25 miles of track from WFLP for $270,000.00. Although GIP never verified the track length, GIP purchased all the track WFLP originally purchased at the GSS bankruptcy foreclosure auction.

In 2006, GIP purchased locomotives for its rail car storage business. "Towards the end of 2006 or early 2007, GIP was ready to start going into the railroad car storage business" alone. (Doc. 82-9, 8-9). GIP has an oral license from the GSS bankruptcy trustee to store rail cars on the eastern excluded property. GIP's representative testified:

> First of all, go back to when we bought the Gulf States Steel assets from the
> bankruptcy. Jim Henderson was the trustee, or the lawyer for the trustee. I think he
> was the trustee and Harry Long was the lawyer for the trustee. But I had a
> conversation with Jim Henderson and he said -- and we were talking about the
> eastern property, and he said you can basically do whatever you want there
> because Gulf States Steel is defunct. And we were talking about how long we
> have to take out kish slag we owned there. We felt that we had the right to just use

6

that property because no one cared, there wasn't anybody to object, and that we --
when we bought it from Williams in 2005, the partnership had been using it for
years. So we were just going to continue to use it.

(Doc. 82-9, 18).

As of 2009, the Gulf States Steel Acquisition Corporation held "fee title" to the eastern

excluded property. (Doc. 74-23, 3). However, the eastern excluded property was placed up for

sale in 2009 for *ad valorem* taxes and no entity purchased the property. Therefore, "tax title" to

the eastern excluded property is now held by the State of Alabama.

Currently GIP operates a rail car storage business using the tracks on GIP's property, but

not the track on the eastern excluded property. GIP charges customers between $2 and $2.50 per

day to store rail cars. GIP could store 39-41 cars per day on the spur lines on the eastern excluded

property. GIP never had any contracts with any customer to store rail cars on the spur lines.

Instead, GIP planned to use the spur lines to store long term, "slow mover" rail cars. (Doc. 82-9,

20). GIP has "been at capacity where we turn cars away." (Doc. 82-9, 20).

**2.     EPA Remediation**

EPA began remediation of the eastern excluded property by 2007. EPA did not allow GIP

on the eastern excluded property after 2007 and posted keep out signs.

EPA hired CMC "to find a way to address the hazardous substances, leachate, and

volume of the waste piles." (Doc. 74-1, 3). CMC first helped EPA remediate leaking tanks, the

coke plant ovens, the power house, and an oil lagoon on the eastern excluded property. EPA then

asked CMC to address the two slag piles. According to EPA, water flow over the metallic

content in the slag piles caused the pH levels in surrounding bodies of water to become harmful

to human life. CMC suggested remediation of the slag piles by mining and recycling the metallic

7

content in the slag piles. CMC asked multiple companies about mining the slag piles, and Harsco expressed interest.

In 2009, Harsco studied the feasibility of mining and recycling the metallic content in the slag piles. The feasibility study showed Harsco that mining the slag piles would be profitable. The feasibility study showed EPA that removal of the metallic content from the slag piles would cost effectively reduce the slag piles' environmental impact. EPA viewed its actions as addressing "the source of the release of hazardous substances from the Site, which acts as an ongoing threat to human health and the environment." (Doc. 74-33, 17).

After the successful feasibility study, Harsco signed a slag processing agreement with CMC. Harsco agreed to mine the slag piles and provide CMC a royalty on the revenue generated by the sale of the recycled metal. CMC credited its royalty to the amounts billed to EPA for all of CMC's work at the GSS facility.

Harsco mined metallic content from the slag piles to generate profit, and Harsco had no knowledge of the alleged environmental benefits of reducing the volume of the slag piles. Harsco chose where to mine the slag piles to find the most profitable materials, whether to remove the materials, and the best price and buyer for the materials.

In 2009, Harsco buried HN1 while processing slag mined from the slag piles because HN1 impeded Harsco's path to rich deposits of recyclable materials. HN1 remains in place today and could be unburied by moving the 50 foot high stockpile of materials on top of HN1.

Additionally, Harsco discovered HS1 and HS2 during mining of the south slag pile. Harsco told EPA about the discovery of HS1 and HS2, which were covered by about an inch of dirt from rain, but were otherwise unburied. EPA never considered the tracks an environmental

hazard. Harsco did not inform EPA when it decided to cut up, remove, and sell HS1 and HS2 as scrap for $14,840.73. GIP estimated the price to replace the spur lines as $500 per ton or $229,644.

Harsco assumed GIP owned track "even further north of HN1." (Doc. 82-7, 24). According to CMC's representative, CMC "[knew] there was a dispute about [other] track" that resolved when "CMC ended up paying for some of the track that was removed," but "CMC didn't undertake to ascertain the owner" of the track. (Doc. 82-4, 13-14). Further, CMC knew that another section of track "that was uprooted . . . was placed in the field" because "[GIP] wanted any rail that [CMC] pulled up . . . to be put in the field closest to [GIP's] buildings." (Doc. 82-5, 2). Additionally, CMC, through EPA, paid GIP "$74,000 for damages to rail" in 2009. (Doc. 82-13, 2; Doc. 82-14, 2).

Harsco also found two buried rail cars while mining: an ingot mold rail car that was not situated on track and did not have any wheels and a bumper car placed at the end of HS1 in the 1970s. Harsco told EPA about the discovery of the two rail cars. Harsco cut up the rail cars for scrap.

Whenever EPA affirmatively directed CMC or Harsco to act, they were obligated to do so. For example, EPA directed where Harsco should store recovered materials, and CMC and Harsco complied with all specific EPA clean up procedures. Further, an EPA representative remained on site or in contact with CMC and Harsco throughout the mining operation.

In 2013, once Harsco's ability to profitability mine the slag piles ended, the project ended with only 25-30% of the slag pile recycled. The rest of the slag pile remains on the eastern excluded property today.

### 3.    Litigation

On January 8, 2014, GIP filed a complaint against the United States of America, CMC, and Harsco for negligently or intentionally burying and selling the spur lines. (Doc. 1). The court dismissed GIP's claims against the United States without prejudice on June 26, 2014, because GIP failed to meet the requirements of 28 U.S.C. § 2675(a). (Doc. 37). CMC and Harsco then filed a motion for summary judgment at the end of discovery. (Doc. 74).

### B.    Standard of Review

Summary judgment is an integral part of the Federal Rules of Civil Procedure that allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Id.* at 322–23.

Once the moving party meets its burden of showing the court that no genuine issues of

material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a *genuine issue for trial*.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added). The moving party need not present evidence in a form admissible at trial; "however, he may not merely rest on [the] pleadings." *Id.*

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). The court must refrain from weighing the evidence and making credibility determinations because these decisions fall to the province of the jury. *Id.* at 255.

Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274,1282 (11th Cir. 1999). The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. After both parties have addressed the motion for summary judgment, the court must grant the motion

*only if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

### C.    Analysis

### 1.    Government Contractor Defense

CMC and Harsco argue they are immune from suit as government contractors. The government contractor defense, established in *Boyle v. United Technologies Corp.*, is based on the doctrine of preemption. *See* 487 U.S. 500, 500 (1988)*.* What matters for purposes of the government contractor defense is whether EPA had a unique interest in the remediation of the eastern excluded property that substantially conflicts with state tort law, and whether CMC and Harsco followed EPA's directions. *Id.* at 504-13. Because CMC and Harsco buried and sold the spur lines without EPA's instruction, the court finds that the government contractor defense does not apply.

Before addressing the elements of the defense, GIP first argues that the government contractor defense does not apply outside of the military context. GIP argues that because the Supreme Court in *Boyle* immunized the United States Marine's helicopter supplier from state law tort claims stemming from the death of a United States Marine copilot, the government contractor defense is limited to the military context.

The court disagrees with GIP. Multiple courts have applied *Boyle's* reasoning outside the military context. *See Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1334 (11th Cir. 2003) (finding *Boyle's* analysis "is not designed to promote all-or-nothing rules regarding different classes of contract"); *see Burgess v. Colorado Serum Co.*, 772 F.2d 844, 846 (11th Cir. 1985) (pre-*Boyle* case rejecting arbitrary distinction between military and non-military contractors); *see*

*Bennett v. MIS Corp.*, 607 F.3d 1076, 1089 (6th Cir. 2010) (finding government contractor defense is a colorable federal defense in the non-military context); s*ee Carley v. Wheeled Coach*, 991 F.2d 1117, 1123 (3d Cir. 1993) (applying *Boyle* in civilian procurement context); *see Boruski v. United States,* 803 F.2d 1421, 1430 (7th Cir. 1986) (applying *Boyle* in public health context); *see Richland-Lexington Airport Dist. v. Atlas Props., Inc.*, 854 F. Supp. 400, 421 (D.S.C. 1994) (applying *Boyle* in EPA remediation context); *see Guillory v. Ree's Contract Service, Inc.*, 872 F. Supp. 344, 346 (S.D. Miss. 1994) (applying *Boyle* in VA security context); *see Lamb v. Martin Marietta Energy Sys., Inc.*, 835 F. Supp. 959, 966 (W.D. Ky.1993) (applying *Boyle* in nuclear production facility context); *but see In re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 810–12 (9th Cir. 1992) (limiting applicability of government contractor defense to military procurement contracts). The government contractor defense applies outside of the military context.

To establish the government contractor defense, CMC and Harsco must demonstrate that (1) EPA had a unique federal interest; (2) a significant conflict exists between the state law and that interest; and (3) their actions were within *Boyle's* "scope of displacement." *See Boyle*, 487 U.S. at 504-13.

### a.     Unique Federal Interest

First, EPA has a unique federal interest that must be protected from interference by state tort law. In *Boyle*, relying on the unique federal interests of the "obligations to and rights of the United States under its contracts" and "civil liability of federal officials for actions taken in the course of their duty," the Supreme Court held that the "the procurement of equipment by the United States is an area of uniquely federal interest." 487 U.S. at 506-507.

The parties disagree about *who* must possess the unique federal interest. CMC and Harsco argue that *EPA's* unique federal interest is the remediation of the eastern excluded property. In contrast, GIP argues that no unique federal interest exists in *CMC and Harsco's* burial and sale of the spur lines. *Boyle* held that the *government actor* rather than the *contractor* must possess a unique federal interest. *Id.* at 511.[1]

Courts have extended the reasoning of *Boyle*, which involved procurement, and have found that government actors may possess unique federal interests in many different federal actions. *See Richland-Lexington Airport Dist.*, 854 F. Supp. at 421 (D.S.C.1994) (assuming without stating that a unique federal interest exists in CERCLA cleanup action); *see In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 197 (2d Cir. 2008) (finding "unique federal interest in coordinating federal disaster assistance and streamlining the management of large-scale disaster recovery projects"); *see Crawford v. Nat'l Lead Co.*, 784 F. Supp. 439, 446 (S.D. Ohio 1989) (finding operation of nuclear materials production facility "involves a uniquely federal interest, that of national defense").

Like in *Richland-Lexington Airport Dist.*, the court finds that EPA's remediation of the eastern excluded property involves a unique federal interest in cleanup of a Superfund site on the national priority list.

### b. Significant Conflict

Second, EPA's interest in remediation of the eastern excluded property is in significant conflict with state tort law. The discretionary function exception to the Federal Tort Claims Act

---

[1] As the court noted in its June 26, 2014 Memorandum Opinion, CMC and Harsco's actions are relevant, albeit later in the government contractor defense analysis.

"suggests the outlines of, 'significant conflict' between federal interests and state law." *Boyle*, 487 U.S. at 511; *see Richland-Lexington Airport Dist.*, 854 F. Supp. at 419 ("[T]he discretionary function exception to the FTCA [] define[s] the parameters of the defense."). The exception excludes "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty." 28 U.S.C. § 2680(a).

This "exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988). If no prescribed course of action exists, then the court "must determine whether that judgment is of the kind that the discretionary function exception was designed to shield" *i.e.* those "based on considerations of public policy." *Id.* at 536-37.

Again, EPA, the *government actor*, rather than CMC and Harsco, the *contractors*, must have exercised discretion. *See Boyle*, 487 U.S. at 511; *see U.S. v. Amtreco, Inc.*, 790 F. Supp. 1576, 1581 (M.D. Ga. 1992) (finding focus of FTCA discretionary function analysis on "EPA decisions").

EPA's decisions regarding how to remediate property are discretionary because they are based on considerations of public policy. In *Amtreco*, the Middle District of Georgia found that Amtreco's claims against the United States for conversion and property damage were barred by the discretionary function exception to the FTCA because "[c]ourts have consistently held that EPA decisions on how to conduct a cleanup operation are shielded by the discretionary function exception." *Amtreco, Inc.*, 790 F. Supp. at 1581; *see U.S. Fidelity & Guaranty Co. v. United States*, 837 F.2d 116, 122 (3rd Cir.); *see Richland-Lexington Airport Dist.*, 854 F. Supp. at 423; *see United States v. Skipper*, 781 F. Supp. 1106, 1114 (E.D.N.C. 1991); *see United States v.*

*Colbert*, 1991 WL 183376, at *3 (S.D.N.Y. Sept. 11, 1991) ("[C]laims arising out of the conduct of government employees in carrying out an EPA response action . . . fall within the discretionary function exception of [the FTCA]."); *see United States v. Nicolet, Inc.*, 1987 WL 8199, at *5-6 (E.D. Pa. Mar. 19, 1987) ("That formulation [to carry out a remediation] did involve policy determinations and it is, therefore, shielded by the discretionary function exception.").

No statute, regulation or policy mandated a particular course of action by EPA. *See* 42 U.S.C. § 9621 ("The President shall select appropriate remedial actions determined to be necessary."). Instead, EPA chose between different remediation options to reduce elevated pH levels in water sources surrounding the eastern excluded property."When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *United States v. Gaubert*, 499 U.S. 315, 324 (1991).

EPA employed CMC (who subsequently employed Harsco) to reduce the volume in the slag piles and recontour the slag piles to flow into the lagoons on the eastern excluded property. EPA chose this course of action in an attempt to balance the effectiveness, speed, and cost of the remediation. EPA exercised its discretion and made a decision to employ CMC and Harsco to mine the slag piles based on considerations of public policy.

Thus, EPA's unique federal interest in remediation of the eastern excluded property and state tort liability are in significant conflict and state tort law must be displaced as to actions directed by EPA.

16

c.      **Scope of Displacement**

Although EPA has a unique federal interest in significant conflict with state law, CMC and Harsco's actions did not fit within the scope of state law displaced by EPA's interest. "Stripped to its essentials, the [government] contractor defense is available *only* when the defendant demonstrates . . . that the government made me do it." *Brinson v. Raytheon Co.*, 571 F.3d 1348, 1351 (11th Cir. 2009) (emphasis added). Ultimately, the court finds that CMC and Harsco did not act at the direction of EPA and, instead, buried and sold the spur lines on their own initiative.

In *Boyle*, the Supreme Court set out a three-part test to determine the scope of displacement:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Boyle*, 487 U.S. at 512. These requirements ensure "the suit is within the area where the policy of the 'discretionary function' would be frustrated" and avoid "some incentive for the manufacturer to withhold knowledge of risks." *Id.*

Thus, CMC and Harsco must show that (1) EPA approved reasonably precise clean-up procedures; (2) CMC and Harsco followed those procedures; and (3) CMC and Harsco revealed to EPA any dangers regarding the cleanup activity unknown to EPA. When the facts are viewed in the light most favorable to GIP, CMC and Harsco have not made this showing.

First, EPA did not establish reasonably precise clean-up procedures for CMC and Harsco for the remediation of the eastern excluded property. "The requirement that prescribed

17

maintenance procedures be reasonably precise is necessary to ensure that a close relationship exists between the contract duty imposed by the federal government and the state law duty that application of the government contractor defense will preempt" and to ensure "that the design feature in question was considered by a Government officer, and not merely the contractor itself." *Hudgens*, 328 F.3d at 1335 (internal quotation marks omitted). In *Hudgens*, a case involving a claim that a government contractor negligently maintained a helicopter, the contractor showed that the government required over 130 individual daily inspections of a helicopter and 150 additional non-daily inspections and provided a thousand page maintenance manual. *See* 328 F.3d at 1337.

When viewing the facts in the light most favorable to GIP, EPA had little input into the plan to remediate the slag piles and provided little daily oversight of the mining operation. CMC developed remediation options for the slag piles and Harsco carried out the feasibility study to determine if mining would be profitable. CMC and Harsco then jointly conducted the mining operation.

Although CMC and Harsco state they complied with all of EPA's clean-up procedures, the record lacks anything reasonably specific that EPA actually did beyond pointing Harsco toward the three million cubic yard slag piles and directing where Harsco should store recovered materials. Further, although an EPA representative remained on site or in contact with CMC and Harsco throughout the mining operation, the record does not reveal anything reasonably specific that EPA's representative did. Finally, though CMC and Harsco submitted over 500 pages of contracts between EPA and its contractors, CMC and Harsco point to *nothing* in the contracts specific to remediation of the eastern excluded properties.

18

Second, CMC and Harsco did not follow EPA procedures, to the extent any existed. A defendant fails to follow government procedures when it fails to perform tasks required by the government. *See Hudgens*, 328 F.3d at 1337. CMC and Harsco did not follow any specific procedures required by EPA and, instead, unilaterally determined how to conduct day-to-day activities including where to mine the slag piles to find the most profitable materials, whether to remove the materials, and the best price and buyer for the materials.

Third, CMC and Harsco failed to reveal to EPA the danger of converting the spur lines. "This notice element requires contractors to inform the government of dangers known to the supplier but not to the United States." *Hudgens*, 328 F.3d at 1336. The parties focus on whether CMC and Harsco notified EPA of unknown *environmental* risks. However, other risks exist during a remediation project, including the risk of converting private property.

Harsco did not inform EPA before it decided to cut up, remove, and sell HS1 and HS2 even though Harsco assumed GIP owned track "even further north of HN1," and CMC "[knew] there was a dispute about [other] track" that was resolved when "CMC ended up paying for some of the track that was removed" in 2009. (Doc. 82-4, 13; Doc. 82-7, 24).

CMC and Harsco failed to follow EPA procedures, to the extent any existed, and failed to inform EPA that a potential risk existed in burying and selling the spur lines. Therefore, CMC and Harsco's actions did not fall within the scope of displacement of state law created by the significant conflict between EPA's unique federal interest in remediation of the GSS facility and Alabama state tort law.

The government contractor defense does not apply because, simply put, the government did not make CMC and Harsco bury and/or sell GIP's spur lines. *See Brinson*, 571 F.3d at 1351.

19

### 2.   *Westfall* **Immunity**

CMC and Harsco also argue that they are entitled to immunity pursuant to *Westfall v. Erwin*, 484 U.S. 292, 292 (1988). However, CMC and Harsco are not entitled to *Westfall* immunity because their actions did not contribute to effective governance.

*Westfall* immunity is based on the sovereign immunity of federal agents. *See* 484 U.S. at 294. *Westfall* immunity previously applied to all federal agents. However, Congress amended the FTCA to provide absolute immunity to government employees for all acts within the scope of their employment, discretionary or otherwise. *See United States v. Smith*, 499 U.S. 160, 163 (1991).

Even though Congress superseded *Westfall* by statute, some circuits courts continue to apply *Westfall* immunity to private actors contracting with the government. *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 72 (2d Cir. 1998); *see Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442, 1447 (4th Cir. 1996); *see Slotten v. Hoffman*, 999 F.2d 333, 337 (8th Cir. 1993). The Eleventh Circuit has not determined whether *Westfall* immunity still applies in the Eleventh Circuit. However, the court need not determine whether *Westfall* immunity continues to apply because CMC and Harsco cannot make out a claim for *Westfall* immunity.

Like the government contractor defense, *Westfall* immunizes discretionary actions. However, unlike the government contractor defense, which focuses on the *government entity*, *Westfall* immunity focuses on the *contractor*. In *Westfall*, the Supreme Court analyzed whether the actual entity that caused the plaintiff's injury, a federal official, acted with discretion. *See* 484 U.S. at 295-97. Thus, for *Westfall* immunity, CMC and Harsco's actions are what matter.

To receive *Westfall* immunity, the government contractor must show that "the

contributions of immunity to effective government in the particular contexts outweigh the perhaps recurring harm to individual citizens." *See* 484 U.S. at 295-96. "Because it would not further effective governance, absolute immunity for nondiscretionary functions finds no support in the traditional justification for official immunity." *Id.* at 297.

CMC and Harsco's actions during the remediation did not contribute to effective governance and, instead, CMC and Harsco acted solely in self interest. Harsco mined metallic content from the slag piles to generate profit and not for the alleged environmental benefits of reducing the slag piles' volume. Harsco chose where to mine the slag piles to find the most profitable materials, whether to remove the materials, and the best price and buyer for the materials.

Harsco discovered HS1 and HS2 while mining the south slag pile and removed HS1 and HS2 to continue mining rich deposits of recyclable materials. Harsco did not inform EPA when it decided to cut up, remove, and sell HS1 and HS2 as scrap for $14,840.73. Harsco buried HN1 while processing slag mined from the slag piles because HN1 impeded Harsco's path to rich deposits of recyclable materials. Once Harsco's ability to profitability mine the slag piles ended, the project ended with only 25-30% of the slag pile recycled. CMC received a royalty on every Harsco sale.

In the light most favorable to GIP, CMC and Harsco's actions did not "further effective governance," and, instead, merely lined CMC and Harsco's pockets. No evidence indicates that CMC and Harsco balanced the interests of the public or third parties against their own when burying and selling the spur lines.

Similarly, *Westfall* barred immunity for those federal employees acting outside " the outer

21

perimeter of [the] official's duties." 484 U.S. at 300. CMC and Harsco have no duties as government *officials*, but burying and selling the spur lines, which they knew may have belonged to GIP, went outside of the duties delegated to CMC and Harsco by EPA.

Even if *Westfall* immunity exists in the Eleventh Circuit, which the court does not decide, CMC and Harsco are not entitled to *Westfall* immunity because their actions did not contribute to effective governance and were motivated solely by their own self interest.

### 3.   Ownership

In addition to immunity, CMC and Harsco also argue that summary judgment is appropriate because GIP cannot prove that it owns or has a legal right to use the spur lines. "Legal title with immediate right of possession by the plaintiffs to the converted property at the time of conversion is a necessary element of the conversion action." *Roberson v. Ammons*, 477 So. 2d 957, 962 (Ala. 1985). GIP has shown legal title and the immediate right to possess the spur lines.

First, GIP presented evidence that it has legal title to the spur lines. In May 2001, WFLP purchased "over (25) miles of in-ground railroad track" at GSS's bankruptcy foreclosure auction for $270,000.00. (Doc. 82-12, 3, 18). In December 2005, GIP purchased all 25 miles of WFLP track for $270,000.00. Although GIP never verified the length of track, GIP purchased all the track WFLP originally purchased at the GSS bankruptcy foreclosure auction. A bill of sale shows legal title. *See Roberson*, 477 So. 2d at 962. GIP provided bills of sale for both transactions. (Doc. 82-12, 3, 18; Doc. 82-15, 5-7)

Further, GIP has not abandoned the spur lines since their purchase. GIP undertook preparations to operate a rail car storage business on the spur lines until 2007. EPA did not allow

GIP onto the eastern excluded property after 2007. GIP continued to claim ownership of the spur lines after 2007 because GIP sought and received a settlement from CMC, through EPA, for removal of other tracks on the eastern excluded property.

Second, GIP presented evidence that it has the immediate right to possess the spur lines. In the light most favorable to GIP, the facts show that GIP had an irrevocable oral license to use the spur lines. Under Alabama law,

> [a] license is often defined as permission to do an act or a series of acts on another's land that, absent authorization, would constitute trespass. . . . An express easement must be in writing to satisfy the Statute of Frauds; a license may be, and often is, given orally.

*Blackburn v. Lefebvre*, 976 So. 2d 482, 490 (Ala. Civ. App. 2007) (citing Jon W. Bruce & James N. Ely, Jr., *The Law of Easements & Licenses in Land* § 11:1 (West 2001).

In 2005, GIP purchased all of WFLP's tracks. To store rail cars on the eastern excluded property, GIP used the permissive use license it previously obtained from the GSS bankruptcy trustee. Specifically, GIP's representative testified:

> First of all, go back to when we bought the Gulf States Steel assets from the bankruptcy. Jim Henderson was the trustee, or the lawyer for the trustee. I think he was the trustee and Harry Long was the lawyer for the trustee. But I had a conversation with Jim Henderson and he said -- and we were talking about the eastern property, and he said you can basically do whatever you want there because Gulf States Steel is defunct. And we were talking about how long we have to take out kish slag we owned there. We felt that we had the right to just use that property because no one cared, there wasn't anybody to object, and that we -- when we bought it from Williams in 2005, the partnership had been using it for years. So we were just going to continue to use it.

(Doc. 82-9, 18).

Additionally, taking the facts in the light most favorable to GIP, GIP's oral license survived any potential transfer of ownership of the eastern excluded property. Under Alabama

23

law,

> when expenditures contemplated by the licensor have been made by the licensee, the license, having been acted upon so as to greatly benefit the licensor, is said to have been executed. An executed license, for reasons founded upon the equitable principle of estoppel, becomes irrevocable and confers upon the licensee a substantive equitable right in the property

*Blackburn*, 976 So. 2d at 492 (citing *Camp v. Milam*, 277 So. 2d 95, 98-99 (Ala. 1973)).

As of 2009, the Gulf States Steel Acquisition Corporation held "fee title" to the eastern excluded property but "tax title" is now held by the State of Alabama. (Doc. 74-23, 3). Even if ownership transferred, GIP relied on its license when GIP purchased locomotives and made other preparations for its rail car storage business in 2006 and 2007. The license became irrevocable notwithstanding any potential transfer of ownership. *See Blackburn*, 976 So. 2d at 492.

CMC and Harsco also argue that the spur lines are fixtures and, thus, are the property of whoever now owns the eastern excluded property. Under Alabama law, one criteria for whether personal property becomes affixed to real property is "[t]he intention of the party making the annexation of making permanent attachment to the freehold." *Milford v. Tennessee River Pulp & Paper Co.*, 355 So. 2d 687, 690 (Ala. 1978). Here, the sale of the spur lines *separate from* the eastern excluded property by the GSS bankruptcy trustee to WFLP and by WFLP to GIP indicate that the parties did not intend for the spur lines to permanently attach to the eastern excluded property.

When the facts are taken in the light most favorable to GIP, GIP has shown legal title to the spur lines based on its purchase of the spur lines from WFLP, and GIP has shown the right to immediately possess the spur lines based on its irrevocable oral license to use the eastern excluded property.

### 4.      Damages

Finally, CMC and Harsco argue that summary judgment is warranted because GIP cannot prove that it suffered damages from CMC and Harsco's burial and sale of the spur lines. The court disagrees.

### a.      Actual Damages

GIP asks for the lost profits from its rail car storage business and the spur lines' lost market value for its negligence and conversion claims. (Doc. 1, ¶¶ 30-31). When the facts are taken in the light most favorable to GIP, GIP has shown evidence of actual damages.

First, GIP has shown evidence of lost profits from its rail car storage business. "Current Alabama law, like the law of other states, authorizes recovery of anticipated profits of an unestablished business, if proved with reasonable certainty." *Super Valu Stores, Inc. v. Peterson*, 506 So. 2d 317, 327 (Ala. 1987). The lost profits "must also be capable of ascertainment with reasonable, or sufficient, certainty, or there must be some basis on which a reasonable estimate of the amount of the profit can be made; absolute certainty is not called for or required." *Id.*

Between 2002 and 2005, WFLP, GIP, and a third party operated a rail car storage business using WFLP's tracks. In December 2005, GIP purchased all 25 miles of track from WFLP for $270,000.00. In 2006, GIP purchased locomotives for its rail car storage business. "Towards the end of 2006 or early 2007, GIP was ready to start going into the railroad car storage business" alone. (Doc. 82-9, 8-9). Currently, GIP operates a rail car storage business using the tracks on GIP's property. GIP charges customers between $2 and $2.50 per day to store rail cars. GIP could store 39-41 slow mover cars per day on the spur lines on the eastern excluded property.

CMC and Harsco try to simplify GIP's business strategy, arguing that GIP "never used the Spur Lines to store railroad cars" and "never had any contracts with any of its customers to specifically store rail cars on the three spur lines." (Doc. 75, 33). However, the rail car storage business is much more complicated. The spur lines branched off of GIP's main line and GIP planned to use the spur lines to store "slow mover" rail cars. Slow mover rail cars stay on GIP's property for longer periods of time. Putting these cars on the spur lines would free up the main line for faster processing of other rail cars.

Also, GIP does not have contracts with customers to "specifically store rail cars on the three spur lines" because GIP's rail car storage business required cars to move around between all of its tracks. Further, WFLP did store rail cars on the spur lines until 2002, and GIP planned to use the spur lines to store rail cars after 2007 when EPA barred GIP from the eastern excluded property. GIP has been at capacity and had to turn cars away. GIP's lost profits are reasonably ascertainable.

Second, GIP has shown evidence of the spur lines' lost market value through the opinion of its expert, Daniel Davies. As discussed above, Davies may give opinions regarding the spur lines' market value.

Additionally, GIP has shown evidence of the spur lines' lost market value through its own estimates. "[A]n owner of property is competent to testify regarding its value." *Neff v. Kehoe*, 708 F.2d 639, 644 (11th Cir. 1983) (quoting *Dietz v. Consolidated Oil & Gas*, 643 F.2d 1088, 1094 (5th Cir.)). "Though such testimony may be self-serving and unsupported by other evidence, . . . it is subject to attack through cross-examination or independent evidence refuting the owner's estimate." *Id.* (quoting *J & H Auto Trim Co. v. Bellefonte Ins. Co.*, 677 F.2d 1365,

26

1369 (11th Cir. 1982) and *Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690, 699 (5th Cir. 1975)); *see In re Sharpe*, 425 B.R. 620, 638 (Bankr. N.D. Ala. 2010) (same). GIP estimated the price to replace the spur lines as $500 per ton or $229,644.

In summary, GIP has shown evidence of its lost profits and the spur lines' lost market value. Any quibbles CMC and Harsco have with GIP's formulas or values are more appropriate for cross examination than summary judgment.[2]

**b.    Punitive Damages**

GIP also asks for punitive damages for its conversion claims. (Doc. 1, 7-8). When the facts are viewed in the light most favorable to GIP, GIP has also shown evidence to support punitive damages.

"An award of punitive damages is proper in a conversion case where the evidence shows legal malice, willfulness, insult, or other aggravating circumstances, or where the conversion is done in the known violation of the owner's rights." *Liberty Nat. Life Ins. Co. v. Caddell*, 701 So. 2d 1132, 1136 (Ala. Civ. App. 1997).

GIP proffered evidence that CMC and Harsco *knowingly* buried and sold the spur lines. Harsco assumed GIP owned track "even further north of HN1." (Doc. 82-7, 24). According to CMC's representative, CMC "[knew] there was a dispute about [other] track" that resolved when "CMC ended up paying for some of the track that was removed," but "CMC didn't undertake to ascertain the owner" of the track. (Doc. 82-4, 13-14). Further, CMC knew that "rail at the coke

---

[2]The parties dispute whether GIP can recover both lost profits from its rail car storage business and the spur lines' lost market value. However, because GIP provided evidence to establish at least one category of damages, the court need not determine at the summary judgment stage whether recovering both categories of damages would create an impermissible double recovery.

plant that was uprooted . . . was placed in the field" because "[GIP] wanted any rail that [CMC] pulled up . . . to be put in the field closest to [GIP's] buildings." (Doc. 82-5, 2). Additionally, CMC, through EPA, paid GIP "$74,000 for damages to rail" in 2009. (Doc. 82-13, 2).

CMC and Harsco argue that they did not know that the spur lines belonged to GIP and, at most, only knew that *other track* on the eastern excluded property belonged to GIP. However, GIP's repeated assertions of its ownership of track on the eastern excluded property raise an issue of material fact whether CMC and Harsco knew that GIP owned the spur lines. Therefore, the court will not strike GIP's claim for punitive damages.

### III.   Conclusion

In conclusion, CMC and Harsco acted independently of EPA to bury and sell the spur lines even though GIP repeatedly made claims to the spur lines. Because their actions did not fall within the scope of displacement of Alabama law created by EPA's unique federal interest in the CERCLA cleanup and because their actions did not further effective governance, CMC and Harsco are not entitled to immunity at this stage. Further, GIP has sufficiently shown its ownership of the tracks and the damages it suffered.

Therefore, the court **DENIES** CMC and Harsco's motion for summary judgment, (Doc. 74), and **DENIES** CMC and Harsco's motion to exclude Davies, (Doc. 76).

**DONE** and **ORDERED** this 22nd day of May, 2015.

_Karon O. Bowdre_
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE